E. I. DU PONT DE NEMOURS AND COMPANY, Petitioner

v.

PUROFIED DOWN PRODUCTS CORP., Louis Puro and Joseph Puro, Respondents.

United States District Court
S. D. New York.
Sept. 9, 1959.

690

Rogers, Hoge & Hills, New York City, for petitioner. William F. Weigel, New York City, of counsel.

Arthur N. Field, New York City, for respondents.

IRVING R. KAUFMAN, District Judge.

Petitioner, E. I. duPont de Nemours and Co. moved this court under Rule 12 of the Civil Rules of the Southern District of New York for an order adjudg-

ing respondents, Purofied Down Products Corp., its president, Louis Puro, and its vice-president, Joseph Puro, in contempt of a consent decree entered on November 4, 1957. Petitioner also moved under Rule 7(b)(1) of the Federal Rules of Civil Procedure, 28 U.S.C.A., for modification of the decree so as permanently to enjoin the respondent corporation from any further use of the name "duPont" or any of petitioner's trademarks. In order to determine the factual issues underlying petitioner's allegations, by order dated January 26, 1959, and upon consent of both parties, I appointed William J. Manning, a member of the firm of Simpson, Thacher & Bartlett, Special Master to take evidence and to report his findings of fact as to whether respondents had violated the terms of the decree.

Evidence was taken before the Special Master on February 11 and 26 and April 1, 2 and 3, 1959.[1] On May 15, 1959, the Special Master filed his report and findings of fact, adjudging respondents in violation of certain provisions of the consent decree, but failing to find violations of other provisions. Both petitioner and respondents now cross-move under Rule 53(e)(2) of the Federal Rules of Civil Procedure for modification of the Special Master's report and for confirmation of the report as modified.

It should be emphasized at the outset that the factual findings of the Special Master come to me armored with a strong presumption of validity. Morris Plan Industrial Bank v. Henderson, 2 Cir., 1942, 131 F.2d 975; Helene Curtis Industries v. Sales Affiliates, Inc., D.C. S.D.N.Y.1954, 121 F.Supp. 490, 494–495, affirmed 2 Cir., 233 F.2d 148, certiorari denied 1956, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80. Under Rule 53(e)(2), I must accept these findings unless they are clearly erroneous.

In this proceeding petitioner must establish respondents' contemptuous conduct by clear and convincing evidence. Fox v. Capital Co., 3 Cir., 1938, 96 F.2d 684, 686.

"When it is doubtful whether a decree of injunction has been violated, a court is not justified in punishing for contempt * * * for the reason that no one can say with any degree of certainty that the authority of the court needs vindication or that the aggrieved party is entitled to remedial punishment." City of Campbell, Mo. v. Arkansas-Missouri Power Co., 8 Cir., 1933, 65 F.2d 425, 427.

"Process of contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct." California Artificial Stone Paving Company v. Molitor, 1885, 113 U.S. 609, 618, 5 S.Ct. 618, 622, 28 L.Ed. 1106.

Before discussing in detail the violations alleged by petitioner, I will sketch briefly the background of the instant controversy.

Petitioner manufactures a polyester fiber sold under the trademark "Dacron". Among its other attributes Dacron is said to possess superior qualities as a fiberfill for pillows, comforters and other so-called sleep products. The corporate respondent manufactures and sells pillows and other sleep products, and has long been a purchaser of duPont's fiberfills, including Dacron.

On October 1, 1957, petitioner commenced the instant action against all three respondents, for infringement of duPont's Dacron trademark and for unfair competition. Petitioner alleged that respondents had infringed its trademark by distributing in interstate commerce pillows and other goods bearing the marks "Daron" and "Dacrilan", had made unauthorized use of and had simulated and copied petitioner's so-called "red labels" and had falsely represented the amount of petitioner's fiber in the goods they manufactured. By consent of

1. In arriving at his findings, the Master heard the testimony of 13 witnesses, both expert and factual. 49 exhibits were offered into evidence.

the parties on November 4, 1957 the action against the individual respondents was dismissed without prejudice and the action against the corporate respondent terminated by the entry of a final decree.[2]

Paragraph 2 of the decree contains eight subparagraphs, five of which re-

strain respondents from certain conduct and three of which are mandatory. In its motion of November 14, 1958, petitioner alleged that respondents had violated all but one [subparagraph 2(g)] of those subparagraphs.

Proof of certain of the violations alleged by petitioner consisted solely in the

2. The decree reads as follows:

"Upon the consent of the parties, there having been no adjudication on the merits, it is hereby

"Ordered, Adjudged And Decreed:

"1. That this Court has jurisdiction of the subject matter and of the parties to this action.

"2. That defendant Purofied Down Products Corp., its officers, agents, present stockholders, servants and employees and all those holding by, through or under them or any of them, and all persons in active concert or participation with them or any of them, and all existing or future corporations or other business enterprises in which any stockholder or stockholders of defendant shall have a substantial, direct or indirect interest, be and hereby are:

"(a) Enjoined and restrained from using in connection with the manufacture, sale, offering for sale or advertisement of pillows or of any other goods the trademarks Daron or Dacrilan or any variations thereof, including Daran and DACRon-acrILAN, or any other colorable imitation of plaintiff's trademark 'Dacron'.

"(b) Enjoined and restrained from representing by any method whatsoever in connection with the manufacture, sale, offering for sale, or advertisement of pillows, or of any other goods, that said pillows or other goods are manufactured, distributed or sponsored by plaintiff.

"(c) Enjoined and restrained from doing any other act or thing calculated or likely to cause confusion or mistake in the minds of the public or to deceive purchasers into the belief that defendant's goods come from or are the goods of plaintiff, or that defendant has any connection with plaintiff.

"(d) Required to indicate affirmatively and prominently on all labels and invoices and in all advertising, making reference to plaintiff's trademark 'Dacron', which are used on or relate to defendant's goods which contain 'Dacron' polyester fiber, mixed with other fibers or materials, the minimum percentage by weight of said 'Dacron' polyester fiber and the presence of such other fibers or materials, and the fact that any 'Dacron' polyester fiber used therein is re-used, reclaimed or reprocessed, if such be the case.

"(e) Enjoined and restrained from using in connection with the manufacture, sale, offering for sale or advertisement of pillows or any other goods, labels distributed by plaintiff or any copies or simulations thereof except with the authorization of plaintiff and in accordance with the instructions of plaintiff.

"(f) Enjoined and restrained from stating, representing or claiming that their pillows or other goods contain polyester fiber or only polyester fiber, unless such be a fair and truthful representation, or making any other false statements or representations with respect to polyester fiber.

"(g) Required, on or before November 1, 1957, to deliver up to plaintiff for destruction all labels, signs, prints, packages, representations, receptacles, advertisements and other writings in the possession of defendant or under its control bearing the terms Daron or Dacrilan, or any variation thereof, including Daran and DACRon-acrILAN, together with each and every reproduction, counterfeit, copy or colorable imitation of plaintiff's distinctive labels, and all prints, molds, matrices and other means of making the same, provided, however, that this paragraph shall not apply to such packages or receptacles which shall have been changed or altered to the satisfaction of plaintiff.

"(h) Required to offer, by written or oral communication to each customer, to repurchase or relabel all of defendant's pillows or other goods previously sold and bearing the terms Daron, Daran, Dacrilan, DACRon-acrILAN, or variations thereof, and to furnish plaintiff, prior to January 1, 1958, with a statement, signed by the president of defendant corporation, advising plaintiff that such offer has been made and the results thereof.

"3. That this action be and hereby is dismissed, without prejudice, as to defendants Louis Puro and Joseph Puro.

"4. That this decree may not be used for advertising.

"Dated this 4th day of November, 1957."

introduction into evidence and examination by the Master of the allegedly violative article. Proof of other allegations depended upon the testimony of expert witnesses concerning tests performed on respondents' pillows and comforters. The hearings before the Special Master were devoted almost entirely to the introduction of evidence falling into the latter category. For convenience of discussion I will group together all of the alleged violations involving proof of laboratory tests and consider them after I have discussed all of the other alleged violations.

### Subparagraph 2(a).

By subparagraph 2(a) respondents were "enjoined and restrained from using in connection with the manufacture, sale, offering for sale, or advertisement of pillows or of any other goods the trademarks Daron or Dacrilan or any variations thereof including Daran and DACRon-acrILAN, or any other colorable imitation of [petitioner's] trademark 'Dacron' ".

The only evidence in support of the alleged violation of subparagraph 2(a) was one pillow bearing the Daron label (Petitioner's Exhibit 31) which had been purchased by petitioner from a retail store in Baltimore, Maryland, subsequent to the entry of the consent decree. The Special Master found that petitioner had failed to prove that this pillow had been sold to the retail store subsequent to the entry of the consent decree. The petitioner does not object to this finding. █ I find that the Special Master's conclusion is supported by the record before him and I, therefore, adopt as a

finding of the Court the Special Master's finding of fact No. 9.[3]

### Subparagrah 2(h).

Under subparagraph 2(h) respondents are "required to offer, by written or oral communication to each customer, to repurchase or relabel all of [respondents'] pillows or other goods previously sold and bearing the terms Daron, Daran, Dacrilan, DACRon-acrILAN, or variations thereof, and to furnish [petitioner], prior to January 1, 1958, with a statement, signed by the president of [respondent] corporation, advising [petitioner] that such offer has been made and the results thereof."

The allegation that respondents had violated subparagraph 2(h) was also supported only by the introduction into evidence of Exhibit 31, the pillow bearing the Daron label purchased by petitioner from a retail store after the entry of the consent decree. The corporate respondent's president, Louis Puro, testified that he had instructed all of respondents' salesmen "on their trips to their stores, wherever they see a Daron pillow, to have the store send it back for credit." (Tr. p. 432.) He further testified that roughly a few hundred such pillows were returned for credit and that to the best of his knowledge, no Daron pillows remained unsold in any store. In addition, Petitioner's Exhibit 41, a letter from Mr. Louis Puro to Mr. William Weigel, attorney for petitioner, purportedly outlining the steps taken to insure compliance with subparagraph 2(h) of the consent decree was introduced into evidence.[4]

---

3. Findings of fact 1 through 8 concern matters that are not in dispute. They are adopted as findings of the Court.

4. "Purofied Down Products Corporation
"1027 Metropolitan Avenue
"Brooklyn 11, New York
"January 8, 1958

"Mr. William Weigel
"Rogers, Hoge and Hill
"41 East 42nd Street
"New York, New York

"Dear Mr. Weigel:

"A summary of the status of the Daron and Dacrilan products in the field follows:

"Sales records were reviewed to determine customers to whom shipments were made.

"Analyses by customers were sent to sales departments in our branches.

"Salesmen visited customers establishments to discuss the elimination of the Daron and Dacrilan items. They were instructed to arrange for relabeling or recall. The salesmen recorded any Daron and Dacrilan items on hand and in the very few cases where items were found they proceeded to discuss disposition measures.

On cross-examination, Puro testified that Exhibit 41 refreshed his recollection that the steps outlined in that letter were carried out by respondents (Tr. p. 446). The Special Master who observed and heard the witness apparently believed this testimony, for he found that respondents had not violated the provisions of subparagraph 2(h) of the consent decree. I find that the Special Master's conclusion in this regard is not clearly erroneous. Accordingly, the Special Master's findings of fact 10 and 11 are correct and are adopted as findings of the Court.

### Subparagraphs 2(b) and 2(c).

I shall consider subparagraphs 2(b) and 2(c) together.

Subparagraph 2(b) provides that respondents are "enjoined and restrained from representing by any method whatsoever in connection with the manufacture, sale, offering for sale, or advertisement of pillows, or of any other goods, that said pillows or other goods are manufactured, distributed or sponsored by [petitioner]."

Subparagraph 2(c) provides that respondents are "enjoined and restrained from doing any other act or thing calculated or likely to cause confusion or mistake in the minds of the public or to deceive purchasers into the belief that [respondents'] goods come from or are the goods of [petitioner] or that [respondents have] any connection with [petitioner]."

In support of its allegation that respondents had violated subparagraphs 2(b) and 2(c), petitioner introduced into evidence two polyethylene pillow containers (Petitioner's Exhibits 10 and 11), the use of which subsequent to the entry of the consent decree is conceded by respondents. The Special Mas-

ter found that the overall impression created by the labels on both the polyethylene containers is that the pillows are either petitioner's product or that the manufacturer is in some way connected with petitioner. He found, therefore, that there was a likelihood of confusion in the minds of the public that the pillows sold in these containers were manufactured by petitioner. My own examination of the two containers leads me to the conclusion that this finding by the Special Master is clearly correct. On both containers the words "duPont" occupies an extremely prominent position. On Exhibit 10, this word is accompanied by the claim "made to rigid duPont specifications". The overall impression of the label is that the pillow was either manufactured by duPont or by someone under duPont's control and direction. Likewise, on Exhibit 11 the words "New * * * DuPont * * * Dacron puff pillow" are prominently displayed. Particular emphasis is given to the word "DuPont". The conclusion is inescapable that the effect of this label will be to create a misapprehension on the part of prospective purchasers that the pillow contained therein is a product of petitioner. On the basis of the foregoing I find that the Special Master correctly concluded that the use by respondents subsequent to November 4, 1957 of polyethylene containers similar to Petitioner's Exhibits 10 and 11 constitutes a violation of subparagraphs 2(b) and 2(c) of the consent decree of November 4, 1957. The Special Master's findings of fact 12 and 13 are, therefore, adopted as findings of fact of the Court.

### Subparagraph 2(d).

Under subparagraph 2(d) respondents are "required to indicate affirmatively and prominently on all labels and invoices and in all advertising, making ref-

"Subsequently, establishments were revisited to determine the effectiveness of the disposition measures, where any items were originally noted.

"As of the current date we believe that there are only negligible amounts of Daron and no Dacrilan in the field.

We feel that further surveys are not necessary. We wish to go on record that we will take back for credit any Daron or Dacrilan items found in the field.

"Very truly yours,
"/sd/ Louis Puro
"President"

erence to [petitioner's] trademark 'Dacron', which are used on or relate to [respondents'] goods which contain 'Dacron' polyester fiber, mixed with other fibers or materials, the minimum percentage by weight of said 'Dacron' polyester fiber and the presence of such other fibers or materials, and the fact that any 'Dacron' polyester fiber used therein is re-used, reclaimed or reprocessed, if such be the case."

Petitioner alleges that subparagraph 2(d) has been violated in two respects:

(1) By failing to indicate on the so-called sew-in label and on the polyethylene container the percentage by weight of the Dacron polyester fiber contained in petitioner's "Puron" pillows which are filled with a blend of Dacron and Acrilan.

(2) By falsely labelling its pillows, in that the label failed to disclose the presence of foreign fibers in pillows supposedly containing 100% Dacron and failed to disclose the correct percentage of Dacron in pillows containing a mixture of Dacron and Acrilan. This second alleged violation of subparagraph 2(d) will be discussed under the heading "Laboratory Tests".

Respondent's "Puron" pillows [5] which are represented to contain 10% Dacron and 90% Acrilan, bear two labels: (a) the "law-label" which is required by law on all pillows and which discloses, inter alia, the quantities by weight of the fibers contained therein; (b) the so-called "sew-in" label (Petitioner's Exhibit 8) which is a manufacturer's label and which names the fibers contained therein, but does not give the relative weights of the fibers. Puron pillows are sold by respondents in polyethylene bags (Petitioner's Exhibit 7) which also indicate the types of fibers contained in the pillows, but fail to disclose the percentages by weight of those fibers. It is petitioner's contention that the failure to disclose on the sew-in label and polyethylene container the percentage by weight of Dacron in respondents' Puron pillows constitutes a violation of the provisions of subparagraph 2(d) of the consent decree.

Respondents do not deny that the sew-in label and container fail to disclose the percentage by weight of Dacron, but urge that they had complied with the requirements of subparagraph 2(d) by including the weight percentages of Dacron on the law-label. It is respondents' position that nothing more than this was required by subparagraph 2(d).

■ The Special Master correctly found that subparagraph 2(d) in clear and unambiguous language expressly requires that the percentages be placed on *all* labels and invoices and in all advertising. This language clearly embraces the sew-in label as well as the polyethylene container. In failing to comply with the provisions of this subparagraph respondents were in wilful contempt.[6]

The Special Master found as a fact, and respondents do not deny, that in 1958 respondents manufactured and distributed approximately 30,000 Puron pillows, packaged and labelled in the manner indicated. The Special Master's findings of

---

5. Respondent has, subsequent to November 4, 1957, distributed the following types of pillows:
 (a) Pillows bearing petitioner's "red label" (Petitioner's Exhibit 3), which were represented to contain 100% Dacron polyester fiber.
 (b) "Puron" pillows which were represented to contain 10% Dacron and 90% Acrilan.
 (c) "Princess" pillows containing Celanese white acetate fiber. (See Petitioner's Exhibit 9.)
 (d) "Princess" pillows containing Dacron fiber. (See Petitioner's Exhibit 10.)

 (e) "Purofied" Puff pillows containing Dacron fiber. (See Petitioner's Exhibit 11.)

6. I find no merit to respondents' contention that because they are required by law to indicate the percentage of fibers on the law-label that this was all that was contemplated by the terms of the consent decree. Indeed, this requirement supports the Special Master's finding. Since respondents were already compelled to indicate these percentages on the law-label there would have been little need to include such a requirement within the terms of the consent decree.

fact 14, 15, 16 and 17 are correct and are hereby adopted as findings of the Court.

### Subparagraph 2(e).

Under subparagraph 2(e) respondents are "enjoined and restrained from using in connection with the manufacture, sale, offering for sale or advertisement of pillows or any other goods, labels distributed by [petitioner] or any copies or simulations thereof except with the authorization of [petitioner] and in accordance with the instructons of [petitioner]."

In April 1955, petitioner began to distribute to its customers, including respondents, distinctive sew-in labels (the so-called "red labels") to be used only on products filled 100% with Dacron polyester fiberfill in quantities specified by petitioner and in accordance with petitioner's instructions. In June 1956, the format of the labels was changed. Petitioner introduced into evidence before the Special Master copies of the label used prior to June 1956 (Petitioner's Exhibit 2) and of the label currently being used (Petitioner's Exhibit 3), and also a copy of its rules governing the use of red labels (Petitioner's Exhibit 1) [7]. These rules contain, inter alia, petitioner's requirements governing the minimum quantity of Dacron by weight which must be used to fill pillows of certain sizes.

Petitioner contends that respondents have violated the terms of subparagraph 2(e) in two respects.

(1) By using labels which were simulations of petitioner's red labels.

(2) By using petitioner's red labels in a manner contrary to petitioner's instructions in that they were used on pillows containing less than 100% Dacron and on pillows which were lighter in weight than the minimum permitted by petitioner's rules for pillows of their size. This allegation will be discussed under the heading "Laboratory Tests".

In support of its contention that respondents used labels which were simulations of petitioner's red labels, petitioner introduced into evidence two of respondents' labels (Petitioner's Exhibits 8 and 9) which it claims are simulations of petitioner's red labels (Exhibits 2 and 3).

Upon an examination and comparison of the four labels, the Special Master found that there was nothing misleading about respondents' labels, nor anything likely to cause them to be confused with petitioner's red labels. He concluded, therefore, that they were not simulations of petitioner's labels.

Petitioner now contends that it was not competent for the Special Master to consider the question of whether there is a likelihood that respondents' labels would be confused with the red labels, because this question had already been determined by the consent decree. In the original complaint, filed in October 1957, petitioner alleged (paragraph 27) that two labels then being employed by respondents (respondents' old labels) were simulations of petitioner's red labels. Copies of respondents' old labels were annexed to the complaint. Petitioner argues that when respondents consented to the decree, they consented not to use the two labels annexed to the complaint. Though petitioner admits that respondents' present labels (Exhibits 8 and 9) are not identical with their old labels, alleged as simulations in the original complaint, it argues that the differences constitute but "the slightest modification", and that, therefore, the use of respondents' present labels was proscribed by the consent decree.

Petitioner offered no evidence to support its contention that the consent decree constituted an admission on respondents' part that the old labels were simulations of petitioner's labels. However, even assuming that such was the purport of the consent decree, it still does

---

7. It was stipulated before the Special Master (R. p. 6) "that at all times pertinent hereto the respondents acknowledge the existence and terms of the said rules."

not follow that the decree necessarily acts as a determination that the present labels are likewise simulations of petitioner's labels. The old labels were never introduced into evidence before the Special Master, so that he could determine for himself whether there were any material differences between them and the present labels. Nor was any evidence introduced to show that the changes made by respondents did not eliminate the objectionable aspects of the old labels.[8] I find, therefore, that in the light of the record before him and me, the Special Master properly considered whether respondents' present labels (Exhibits 8 and 9) were likely to be confused with petitioner's red labels (Exhibits 2 and 3) and that he correctly concluded that there was no likelihood of confusion. The Special Master's findings of fact 22(a), (b) and (c), 23(a) and (b) and 24 are correct and are adopted as the findings of this Court.

### The Laboratory Tests

In accordance with its practice of ensuring that its products are not misused by manufacturers of finished products, petitioner, subsequent to November 4, 1957, purchased a number of respondents' pillows and comforters for testing. It submitted 51 pillows and one comforter[9] thus purchased to the United States Testing Company. The goods were measured and weighed and analyzed to determine the relative percentages of the fibers constituting the filling. There is little dispute concerning the accuracy of the weighing and measuring tests, but respondents sharply contest the accuracy of the tests employed to analyze fiber content.

The hearings before the Special Master were devoted almost exclusively to evidence concerning the validity of the tests performed. The employees of the United States Testing Company who performed the tests were called to the stand to explain the manner in which they were conducted. They testified that the sample to be tested was obtained by extracting small quantities of the filling from the four corners and from the center of the pillow or comforter. The filling thus obtained was hand blended by the tester and, of the total extracted from the article, approximately 2 grams or less were selected for the tests. Two testing methods were employed; a microscopic method and a chemical method. Under the microscopic method the 2-gram sample extracted for analysis was placed under a microscope and a section thereof, consisting of a minimum of 2,000 fibers, was examined to determine on the basis of the physical differences in the two fibers the quantities of such fiber present.

Under the chemical method the 2-gram sample was immersed in a solution of nitric acid. The sample was weighed before and after immersion in the nitric acid. It was the testimony of petitioner's expert witnesses that Acrilan is soluble in nitric acid whereas Dacron is not. They, therefore, concluded that any difference in the weight of the sample before testing and after testing represented a quantity of Acrilan which had been dissolved out by the nitric acid.

8. Indeed, my own comparison of Petitioner's Exhibit 9 with Exhibit 4 annexed to the original complaint reveals that the word "Daron" in the original label has been eliminated and the words "Modern Living Fibers" have been substituted therefor in the new label. It is reasonable to assume that it was the word "Daron" more than any other feature of the old label, that would be likely to cause confusion.

9. 40 pillows were labelled as containing 100% Dacron; one was a comforter labelled as containing 100% Dacron and the other eleven were pillows labelled as containing 90% Acrilan and 10% Dacron. Of the 40 labelled as containing 100% Dacron, 28 were found to contain 100% Dacron. The remaining 12 were reported to range from 98.2% to 98.6% Dacron. (Petitioner's Exhibits 19 through 30.) The comforter was reported to contain 29% Acrilan (Petitioner's Exhibit 18). Of the 11 pillows represented to contain 10% Dacron, 9 were reported to contain from less than 1% to 8.2% Dacron. (Petitioner's Exhibits 32 through 40.)

Expert witnesses called on behalf of respondents contested the accuracy of these tests. They testified that the microscopic method is not an accurate test for determining the relative quantities of fibers present and that the chemical test is based upon a false premise because their own tests disclose that Dacron is partially soluble in nitric acid.

It is petitioner's contention that the tests disclose that respondents violated the terms of the consent decree in basically three respects:

(1) By failing to disclose the presence of foreign fibers in pillows which supposedly contain 100% Dacron polyester fiber. This would constitute a violation of subparagraph 2(f) under which respondents are "enjoined and restrained from stating, representing or claiming that their pillows or other goods contain polyester fiber or only polyester fiber, unless such be a fair and truthful representation, or making any other false statements or representations with respect to polyester fiber." It would also violate subparagraphs 2(d) and 2(e) quoted supra.

(2) By failing accurately to label its pillows which purportedly contain a blend of Dacron and Acrilan. This would violate subparagraphs 2(f) and 2(d).

(3) By selling pillows bearing petitioner's red labels which violate the rules governing the use of those labels in that their fiber content was less by weight than the minimum permitted by petitioner's rules. This would violate subparagraph 2(e).

It should be noted at the outset that petitioner's rules governing the use of its red labels provide that it "will take into consideration minute, unavoidable manufacturing deviations (which shall in no case be in excess of 1% of material or ½ oz. in weight) which occur despite the exercise of due care."

In support of the allegation that respondents failed to disclose the presence of foreign fibers in pillows supposedly containing 100% Dacron, petitioner introduced into evidence before the Special Master twelve pillows (Petitioner's Exhibits 19 through 30) manufactured by respondents and represented as being filled 100% with petitioner's Dacron polyester fiber. The United States Testing Company reported that its tests disclosed that the pillows contained from 1.4% to 1.8% of fibers other than Dacron. On the basis of this evidence petitioner would have me conclude that the twelve pillows were falsely represented to contain 100% duPont Dacron polyester fiber.

The Special Master found that petitioner failed to sustain its burden on this point. This finding was based on his conclusion that the samplings used by the United States Testing Company to make its tests were too small to be truly representative of the entire contents of the pillows. The pillows in question weighed approximately 20 ounces. The test sample weighed 2 grams or less. Thus the findings of the United States Testing Company were based upon a test of from $\frac{1}{300}$ to $\frac{1}{600}$ of the entire contents of the pillow. The Master concluded that the testing of such minute samples and the finding of such minute differences did not satisfy him that the analysis of the content of the entire pillow would result in the same conclusion "for the presence of but a few foreign fibers—because of the contamination problem inherent in the operation—could well be the cause of the variation in the small sample tested while the actual percentage of foreign fiber contained in the entire pillow could well be within the 1% allowance." (Report of Special Master, p. 11.) [10] In view of his conclusion that, on the basis of the sampling size alone, the tests were inconclusive, the Master found it unnec-

10. As an example the Master cited Petitioner's Exhibit 19 which weighed 1.3397 grams before testing. After the chemical test performed by the United States Testing Company, the weight was reported to be 1.3199 grams, a difference of .0198 gram, which petitioner claims represented fiber other than Dacron polyester fiber which had been dissolved in the testing. Mathematical calculations made on the basis of this difference resulted in petitioner's conclusion that the entire pillow had contained 1.5% foreign fiber by weight.

essary to resolve the dispute concerning the accuracy of the test procedures employed. On the basis of the entire record, I find that the Master's conclusion that petitioner had failed to establish the presence of foreign fibers in Exhibits 19 through 30 in the amounts alleged was far from clearly erroneous.

Nor do I find it sufficient that petitioner established that some foreign fibers were present in these exhibits. The evidence before the Special Master clearly established that some degree of contamination is an unavoidable occurrence under the best manufacturing procedures. In the absence of other evidence, this fact is important in construing the intended effect of subparagraphs 2(d) and 2(f). Surely it could not have been petitioner's intent at the time of drafting the consent decree to require respondents to disclose the presence of foreign fibers in its pillows in amounts which were minute and unavoidable. It is unreasonable to believe, for example, that petitioner intended to require respondents to disclose the accidental presence of foreign fibers in their pillows in amounts falling within the permissible range of petitioner's own rules. Though respondents must have known that some contamination was inevitable, there was no showing that they were able to determine which pillows contained the foreign fibers.

■ On the basis of the foregoing, I find that subparagraphs 2(d) and 2(f) properly construed, did not require disclosure by respondents of foreign fibers in such minute quantities. I, therefore, conclude that petitioner failed to establish that respondents falsely represented that their goods contained 100% Dacron polyester fiber.[11]

In support of its allegation that respondents failed accurately to label pillows which purportedly contained a blend of Dacron and Acrilan, petitioner introduced into evidence nine of respondents' Puron pillows which were represented to contain 90% Acrilan fiber and 10% of petitioner's Dacron polyester fiber. (Petitioner's Exhibits 32 through 40.) Tests performed by the United States Testing Company disclosed that the pillows in fact contained from less than 1% to 8.2% Dacron.[12] The Special Master found that these reported variations, if established, would be "substantial." However, he determined that petitioner had failed to establish that the pillows were in violation of the provisions of the consent decree. This finding is bottomed upon the fact that respondents' method of blending fibers such as Dacron and Acrilan results more nearly in a heterogeneous than a homogeneous mixture "so that any one sample taken from a pillow might not be representative of the content of the entire pillow and, indeed, any few samples taken from various parts of the pillow and mixed together might not be representative." (M.R. p. 26.)

There was considerable conflict in the expert testimony on this point. The Special Master who heard the witnesses and observed them as they testified, was in the best position to determine which of this testimony was believable. He placed particular stress upon the testimony of Mr. William Landes, called on behalf of respondents, who testified that

11. Petitioner's Exhibit 18, a comforter represented as containing 100% Dacron but reported by the United States Testing Company to contain 29% Acrilan, was not discussed in the Special Master's Report. Assuming, without deciding, that the microscopic test by which this comforter was analyzed was sufficiently accurate to establish it as a deviation, I find it insufficient proof that the consent decree has been violated. Out of respondents' large production of pillows and comforters supposedly containing 100%

Dacron 41 items were selected by petitioner for testing. (See footnote 9, supra.) Proof that one of these items deviates from the standard set out in the consent decree is not clear and convincing proof of a violation.

12. Petitioner contends that all nine constitute "mislabeling" violations of subparagraph 2(d), and that Exhibits 33, 35, 36, 37, 38 and 40 violate subparagraph 2(f) in that they allegedly contained absolutely no Dacron or only trace quantities.

unless taken in a certain way, a sample would not be representative of the entire pillow. Landes explained that in the manufacture of respondents' pillows, a thin gossamer web of fiber is formed by a machine known as a garnett machine. The contents of the pillow, known as the "bat", is built up by repeatedly superimposing the gossamer web upon itself until the bat is 10 or 15 layers thick. According to Landes, unless the testing samples were taken in vertical sections of the bat "they would not be truly representative of the entire bat." (Tr. p. 530.)

As to these pillows also, there is dispute as to the accuracy of the testing methods employed. Exhibit 40 was analyzed by the chemical method. Exhibits 32 through 39 were analyzed microscopically, under which procedure only a small part of the already small 2-gram sample is actually analyzed. Again, the Special Master found it unnecessary to resolve this dispute, since he placed his finding on another ground.[13]

■ The Special Master did not limit his findings to a determination of whether violations had been established, but also made findings concerning the absence of wilfullness on respondents' part, and concerning respondents' adherence to the standard procedures in the pillow manufacturing industry. While I find that these findings are not clearly erroneous in themselves, petitioner correctly asserts that they are not material to the issue of whether a violation occurred. I find, however, that a fair reading of the Special Master's report leads to the conclusion that his findings were not based upon these immaterial factors. He did not find that a violation was not contemptuous because not wilful; he found that no violation had been established. In view of the fact that there is a dispute,

not only as to the method of extracting samples to be tested, but also as to the sufficiency of the sampling size and the adequacy of the testing methods employed, I find that the petitioner has fallen far short of establishing a violation of subparagraph 2(f) and a "mislabeling" violation of subparagraph 2(d) by "clear and convincing evidence."

Accordingly, the Special Master's findings of fact 25, 26, 27, 31, 32 and 33 are correct and are adopted as the findings of the Court. Findings 28, 29 and 30 are not material to the issues herein and I decline to adopt them. Finding of fact 34 is misleading and I decline to adopt it.

In support of the contention that respondents sold pillows bearing petitioner's red labels which were lighter in weight than the minimum permitted under petitioner's rules, petitioner introduced into evidence six allegedly lightweight pillows. (Petitioner's Exhibits 12 through 17.) The Special Master found that the six pillows were filled with smaller quantities of filling material than the minimum specified by petitioner's rules for pillows of such size bearing such of petitioner's labels. The Master further found that this constituted a violation of subparagraph 2(e) of the consent decree, but he characterized the violation as "technical, inadvertent and unintentional." Respondents do not object to these findings. Petitioner objects to the Master's characterization as "technical, inadverent and unintentional."

■ I find that the record amply supports the Master's determination that the violations occurred. There was no serious dispute concerning the accuracy of the weighing and measuring tests performed on the six pillows in question. I also find that the Master has correctly described the violation as "inadvertent and unintentional." However, this find-

---

13. Petitioner contends that in his testimony Mr. Louis Puro admitted that some pillows did not contain the amounts of Dacron polyester Fiber disclosed by the labels. However, this is not an accurate interpretation of Mr. Puro's testimony. He said (Tr. pp. 490–491) that such deviations *may* occur but that he adds 15% Dacron polyester fiber to the mix in order to avoid such deviations. I do not construe this to be an admission that there are in fact such deviations, nor do I find that it relieves petitioner of its burden of proving that violations did occur.

ing is material on the question of damages only. Wilfulness is not an element of civil contempt. Telling v. Bellows-Claude Neon Co., 6 Cir., 77 F.2d 584, 586, certiorari denied 1935, 296 U.S. 594, 56 S.Ct. 108, 80 L.Ed. 420.

The Special Master's findings of fact 18, 19 and 20 are adopted as findings of this Court. The words "technical, inadvertent and unintentional" in the Master's finding of fact 21 are misleading inasmuch as they may create the impression that no violation had been found. I, therefore, amend the Master's finding of fact 21 by striking out the words "technical, inadvertent and unintentional" and as amended I adopt it as a finding of the Court.

### Modification of the Decree

Petitioner also moves under Rule 7(b)(1) of the Federal Rules of Civil Procedure for modification of the decree so as permanently to enjoin the respondent corporation from any further use of the name "duPont" or any of petitioner's trademarks. The granting of such a motion is within the sound discretion of a court of equity where it deems that the moving party has shown the occurrence of such facts since the entry of the original decree as to make modification necessary for its protection. While petitioner has established several violations of the terms of the decree, the relief it seeks is most drastic since it will cut respondents off entirely from the use of the duPont name and trademark and thus place them at a competitive disadvantage. I find that the petitioner has not established that so drastic a remedy is necessary for its protection at this time. Such a remedy would be disproportionate to the violations found. I, therefore, deny the motion for modification of the consent decree. Of course, petitioner may renew this motion at a later date upon a showing of further violations by respondents of the decree of November 4, 1957.

### The Cost of the Reference

Under Rule 53 of the Federal Rules of Civil Procedure the manner of taxing the cost of the reference is discretionary with the Court. The cost may be shared equally by the parties, or imposed as a cost upon the unsuccessful party or imposed in any other manner within the Court's sound discretion. In the instant case, petitioner was successful in establishing certain violations of the consent decree. However, the hearings devoted much time to evidence on alleged violations which were not established. Thus, it may fairly be stated that petitioner was the unsuccessful party in regard to some alleged violations and successful in the respects already indicated. Therefore, in the exercise of my discretion I conclude that each side shall pay one-half of the Master's fees.

### Findings of Fact

The following are the findings of fact of the Court:

1. The Court has jurisdiction over the subject matter of and the parties to this proceeding.

2. Petitioner, E. I. DuPont de Nemours and Company, is a corporation duly organized and existing under the laws of the State of Delaware and was plaintiff in the original action out of which this proceeding arises.

3. Respondent Purofied Down Products Corporation is a corporation duly organized and existing under the laws of the State of New York and was a defendant in the original action out of which this proceeding arises.

4. Respondent Louis Puro is a citizen of the State of New York and is President of respondent Purofied Down Products Corp.

5. Respondent Joseph Puro is a citizen of the State of New York and is Vice President of respondent Purofied Down Products Corp.

6. Respondents Louis Puro and Joseph Puro are actively engaged in and responsible for the conduct and control of the affairs of respondent Purofied Down Products Corp.

7. This Court, on November 4, 1957, entered a final decree by consent herein

which, by its terms, contained certain injunctive provisions in paragraph 2 thereof.

8. The aforesaid consent decree herein was signed by respondent Louis Puro on October 25, 1957, was duly served upon respondent Purofied Down Products Corporation, and respondent Joseph Puro was served with a certified copy of said consent decree on November 12, 1957.

9. Petitioner has failed to establish that respondents have used the trademark "Daron" in connection with their sale of pillows subsequent to the entry of the consent decree herein dated November 4, 1957.

10. After the entry of the consent decree of November 4, 1957, respondents offered to repurchase from their customers the pillows containing the trademark "Daron" sold prior thereto.

11. Petitioner has failed to establish that respondents have violated paragraph 2(h) of the consent decree herein by failing to offer, by written or oral communication to each of their customers, to repurchase or relabel all of respondents' pillows or other goods previously sold and bearing the terms Daron, Daran, Dacrilan, DACRon-acrILAN, or variations thereof.

12. Respondents have, since the entry of the consent decree herein, distributed pillows in polyethylene containers, similar to Petitioner's Exhibits 10 and 11, on which there are prominently displayed the petitioner's name and trademark, DUPONT displayed within an oval, in such a manner as to cause confusion or mistake in the minds of the public or to deceive ultimate purchasers into the belief that respondents' goods either came from or are the goods of petitioner or that respondents have some connection with petitioner.

13. The said use by respondents subsequent to November 4, 1957 of polyethylene containers similar to Petitioner's Exhibits 10 and 11 constitutes a violation of paragraphs 2(b) and 2(c) of the consent decree herein dated November 4, 1957.

14. Respondents have, subsequent to November 4, 1957, sold "Puron" pillows packaged in polyethylene containers similar to Petitioner's Exhibit 7 and bearing sew-in labels similar to Petitioner's Exhibit 8.

15. Respondents' "Puron" pillows were claimed to be filled with a blend of 90% "Acrilan" acrylic fiber and 10% "Dacron" polyester fiber, but neither the polyethylene containers (Petitioner's Exhibit 7) nor the sew-in labels (Petitioner's Exhibit 8) contained any indication of the percentage of "Dacron" polyester fiber in the pillows.

16. Respondents manufactured and distributed approximately 30,000 "Puron" pillows, so packaged and labelled, in 1958.

17. Respondents, since November 4, 1957, have violated paragraph 2(d) of the consent decree herein by failing to indicate affirmatively and prominently on the "Puron" polyethylene containers and the "Puron" sew-in labels, which made reference to petitioner's trademark "Dacron", the minimum percentage by weight of the "Dacron" polyester fiber in said "Puron" pillows.

18. Petitioner's Exhibit 1 in evidence is a true copy of petitioner's Rules governing the use of its so-called "Red Labels"; at all times pertinent hereto, the respondents acknowledged the existence and terms of the said rules and agreed to be bound thereby.

19. Respondents' procedures and methods of filling and weighing pillows do not vary from the standard practices of the industry, and respondents have used their best efforts to insure accuracy in weight and compliance with the weight requirements of petitioner's Rules governing the use of its labels.

20. Six of respondents' pillows, sold by it subsequent to the consent decree herein and bearing petitioner's labels, were filled with smaller quantities of filling material than specified by petition-

er's Rules for pillows of such size bearing such of petitioner's labels.

21. Respondents' sale of said six pillows constitutes a use of petitioner's labels not in accordance with its Rules and a violation of paragraph 2(e) of the consent decree herein dated November 4, 1957.

22(a). Petitioner's Exhibit 2 is a specimen of petitioner's fiberfill label which was distributed to petitioner's customer's including respondents, prior to June, 1956, for use only in accordance with petitioner's Rules.

(b) Petitioner's Exhibit 3 is a specimen of petitioner's so-called "Red Label" which has been distributed to petitioner's customers, including respondents, subsequent to June, 1956, for use only in accordance with petitioner's Rules.

(c) Respondents had knowledge of the existence of, and used in their business, each of petitioner's said labels.

23(a). Petitioner's Exhibit 8 is a specimen of respondents' sew-in label used on their "Puron" pillows.

(b) Petitioner's Exhibit 9 is a specimen of respondents' "Modern Living Fibers" sew-in label used on their "Princess" pillows.

24. Petitioner's Exhibits 8 and 9 respectively are not simulations or copies of Petitioner's Exhibits 2 and 3 respectively, and their use by respondents is not a violation of paragraph 2(e) of the consent decree herein dated November 4, 1957.

25. Subsequent to the date of the entry of the consent decree herein, petitioner purchased fifty-one pillows and one comforter, each of which was manufactured by respondents.

26. Respondents' aforesaid comforter and all but one of their aforesaid pillows were sold by respondents subsequent to the entry of the consent decree herein.

27. Rspondents' aforesaid comforter and all but one of their aforesaid pillows were analyzed by the United States Testing Company, Hoboken, New Jersey, an independent testing laboratory.

31. The petitioner has failed to establish that any of the representations made to the trade and to consumers by the respondents that their pillows and comforters contained only petitioner's "Dacron" polyester fiber were false and untrue.

32. The petitioner has failed to establish that the respondents failed to disclose the presence or nature of other fibers and materials which were mixed with petitioner's "Dacron" polyester fiber in their pillows and comforters.

33. The petitioner has failed to establish that the respondents made false representations as to the percentage or amount of petitioner's "Dacron" polyester fiber contained in their pillows and comforters.

The following findings while accurate are immaterial to the issues herein and are not adopted:

28. Petitioner has failed to establish that the procedures and methods of manufacture used by respondents vary from those generally used in the industry.

29. Occasional and slight contamination of the fibers contained in respondents' pillows and comforters is unavoidable, and such contamination is recognized in the industry as an ever present risk.

30. The respondents have used their best efforts to minimize contamination in their products.

### Conclusions

1. Petitioner has established that respondents are in violation of subparagraphs 2(b), 2(c), 2(d) and 2(e) of the consent decree of November 4, 1957, in the respects indicated in the foregoing opinion and findings of fact. Respondents Purofied Down Products Corp., Louis Puro and Joseph Puro, are accordingly adjudged in civil contempt for violation of the decree in the manner indicated.

2. Petitioner failed to establish that respondents violated subparagraphs 2(a), 2(f) and 2(h) of the consent decree.

704

3. In the exercise of my discretion under Rule 53, I conclude that the cost of the proceedings before the Special Master shall be shared by petitioner and respondents in the following respect: one-half by petitioner and one-half by respondents.

4. Petitioner's motion for modification of the consent decree is denied.

5. An accounting for damages sustained by petitioner, by virtue of the contempt, including respondents' profits, is directed and shall proceed before William J. Manning, the Special Master previously appointed herein upon the consent of the parties.

Settle order.