**TRANS WORLD AIRLINES, INC.,**
Plaintiff,

v.

**Howard R. HUGHES, Hughes Tool Company and Raymond M. Holliday,**
Defendants.

**No. 61 Civ. 2324.**

United States District Court
S. D. New York.

Dec. 23, 1969.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for plaintiff; John F. Sonnett, Paul W. Williams, Dudley B. Tenney, Immanuel Kohn, Marshall H. Cox, Jr., Abraham P. Ordover and Fred E. Scharf, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, and Chester C. Davis, New York City, for defendants Hughes Tool Company and Raymond M. Holliday; Ralstone R. Irvine, James V. Hayes, George S. Leisure, Jr., Mahlon F. Perkins, Jr., Chester C. Davis, Maxwell E. Cox, Ronald J. Cayo, John H. Wilkinson and Paul E. Goodspeed, New York City, of counsel.

METZNER, District Judge.

The special master, Herbert Brownell, Esq., has submitted his report awarding plaintiff $137,611,435.95 as damages after trebling as provided in § 4 of the Clayton Act, 15 U.S.C. § 15. The matter had been referred to him for assessment of damages following the entry of a default judgment imposed as a sanction for failure of Howard R. Hughes to appear for deposition. Trans World Airlines, Inc. v. Hughes, 32 F.R.D. 604 (S.D. N.Y.1963). In the ensuing discussion, plaintiff will be referred to as TWA and defendants Howard R. Hughes and Hughes Tool Company as Hughes and Toolco, respectively.

Both parties have filed objections to the report. The defendants move to confirm those portions of the report which are favorable to them and move to reject those portions which are adverse to their position. If their contentions are correct, TWA is not entitled to any damages. TWA objects to the report on the ground that the amount awarded is inadequate. The maximum figure for which it contends is $510 million plus prejudgment or moratory interest of over $175 million. The respective contentions of the parties will be discussed below.

The history of this litigation, in which TWA sought damages for claimed antitrust violations, shows that it has been long and complex. It was originally instituted on June 30, 1961. On August 31, 1961, the case was assigned to me for

all purposes pursuant to Rule 2 of the General Rules of this court. Since then it has been the subject of many pretrial rulings, opinions and appeals. The sufficiency of the complaint was upheld in an opinion reported in 214 F.Supp. 106 (S.D.N.Y.1963). In that opinion this court also ruled adversely to defendants' contention that the acts complained of were exempt from the antitrust laws by virtue of certain orders of the Civil Aeronautics Board. After the court was informed that Hughes would refuse to appear for examination, it granted TWA's application for a default judgment. 32 F.R.D., *supra*. The Court of Appeals affirmed the rulings found in 214 F.Supp., *supra*, but refused to pass upon the propriety of the entry of the default judgment. 332 F.2d 602 (2d Cir. 1964). On March 8, 1965, the Supreme Court dismissed writs of certiorari as improvidently granted. 380 U.S. 248, 249, 85 S.Ct. 934, 13 L.Ed.2d 817, 818. The special master and the court then made preliminary rulings as to the effect of the default judgment on the damage hearings. 38 F.R.D. 499 (S.D.N.Y.1965).[1]

The hearings before the special master commenced on May 2, 1966. Some 11,000 pages of testimony were taken from expert witnesses in the fields of economics, engineering, finance and accounting. Over 800 exhibits containing 60,000 pages were admitted in evidence. The special master thereafter rendered a 323-page report. A hearing was held on the objections of the parties to the report. They submitted over 1,300 pages of briefs and memoranda, including a 62-page listing by defendants of 216 specific objections to the report.

At page 12 of his report, the special master states, "Despite prior rulings in the case, this [effect of the default] has been the subject of continuing disagreement between the parties in the damage hearings." I thought that this issue had been clearly disposed of in the preliminary report of the original special master, dated July 30, 1965, and in this court's opinion in 38 F.R.D. 499.

As stated in that opinion at page 501:

"Liability is not an issue for the Special Master except in a very limited sense. The sufficiency of the complaint has already been established by the denial of defendant's motion to dismiss. 214 F.Supp. 106 (S.D.N.Y. 1963), aff'd, 332 F.2d 602 (2d Cir. 1964), writ of cert. dismissed, 380 U.S. 248, 85 S.Ct. 934, 13 L.Ed.2d 817 (1965). By virtue of the default the defendant has admitted the truth of the well-pleaded allegations of the complaint. Thomson v. Wooster, 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885)."

In the present report, the special master has referred to another case, Harshman v. Knox County, 122 U.S. 306, 7 S.Ct. 1171, 30 L.Ed. 1152 (1887), which on its

---

1. Despite these rulings defendants moved to compel TWA to come forward with evidence to preclude the finding of a fact which in effect would remove the basis of TWA's claim. In a memorandum opinion dated January 4, 1966, denying the motion, the court said:

"A 7-inch stack of affidavits, briefs and supporting documents has been submitted in connection with this motion. After reading them and listening to defendant's extensive argument, one wonders why the case was never defended on the merits, if all that defendant contends for is true. At this late date, after the complaint has been sustained and a default judgment entered, with appeals to the Court of Appeals and a writ of certiorari dismissed by the Supreme Court, defendant now, in effect, seeks summary judgment in its favor. It asks that plaintiff come forward to negative a fact which defendant asserts as true. The shoe is on the other foot. The plaintiff has a judgment in its favor and the only limitation thereon has been spelled out in the order of the Special Master dated July 30, 1965 and the order of this court dated November 16, 1965. Together they outline the procedures to be followed before the Special Master, where the matter is properly pending. The court cannot conceive of any further reason for delay in proceeding before the Special Master until the hearings are completed."

facts is even stronger than Thomson v. Wooster, *supra*. Without going into the details of that case, it is sufficient to quote the Court's language at page 317, 7 S.Ct. at pages 1175–1176:

"In the absence of a denial, the fact as stated in the petition of the plaintiff is confessed by the default, and stands as an admission on the record, of its truth by the defendant."

In the hearings before the special master, TWA did not have to present any evidence to support the well-pleaded allegations of the complaint, and defendants may not offer evidence to controvert such allegations. To the extent that they did, it will be disregarded. That opportunity was forfeited by defendants as a result of the default.

■ Defendants may show, however, that an allegation is not well pleaded, but only in very narrow, exceptional circumstances. The *Thomson* and *Harshman* cases clearly support this rule. For example, an allegation made indefinite or erroneous by other allegations in the same complaint is not a well-pleaded allegation. Other examples, as detailed in 38 F.R.D. at 501, are allegations which are contrary to facts of which the court will take judicial notice, or which are not susceptible of proof by legitimate evidence, or which are contrary to uncontroverted material in the file of the case. That opinion went on to say:

"However, it may be shown by plaintiff, in the context of this case, that some matters of which the court may take judicial notice should not be so noticed. See McCormick, Evidence § 330 (1954). Where file material is involved, if the plaintiff did not have full opportunity to meet or controvert such material, then it should not be used to nullify the allegation. If evidence merely tends to show that an allegation is not true, the allegation must be taken as true in this default. Finally, the plaintiff is entitled to the benefit of all reasonable inferences from the evidence tendered.

"Attempts by defendant to escape the effects of its default *should be strictly circumscribed*. It should not be afforded an opportunity to litigate what has already been deemed admitted in law. *In the absence of an exceedingly strong showing* that an allegation is untrue *under the rules set forth above*, the allegation stands as admitted." 38 F.R.D. at 501 (emphasis added).

This quoted language had in mind the impact of the failure of Hughes to appear for deposition. His default stymied TWA in the acquisition and presentation of evidence in support of its claim. As the Court of Appeals said (332 F.2d at 614):

"We think it clear beyond any question, in light of all the circumstances here presented, that the deposition of Hughes was necessary to all aspects of this litigation * * *."

And again at page 615:

"Hughes' deposition was absolutely essential to the proper conduct of the litigation."

■ Defendants claim that there are allegations in the complaint which are contrary to facts of which the court will take judicial notice. They particularly refer to that portion of the third paragraph of the complaint which alleges that Toolco was engaged

"since in or about 1939 in the development, manufacture and acquisition of aircraft and related equipment from the manufacturers thereof in various states and in the sale and lease of such aircraft to air carriers in various other states for use in interstate and foreign commerce."

They request that judicial notice be taken of the fact that Toolco never "manufactured" or engaged "in the sale and lease" of aircraft. I cannot take judicial notice of these matters because they are not indisputably true.

The question whether judicial notice can be taken of facts which are not

indisputable has been the subject of disagreement among scholars. Wigmore thought that notice should not be limited to indisputable facts. He took the position that the taking of judicial notice of a fact merely relieved the offeror of more formal proof. However, this did not prevent his opponent from disputing the fact by offering contrary evidence. 9 Wigmore, Evidence § 2567 (3d ed. 1940). See also Thayer, Preliminary Treatise on Evidence 308–309 (1898); Ohio Bell Telephone Co. v. Public Utilities Comm'n of Ohio, 301 U.S. 292, 301–302, 57 S.Ct. 724, 81 L.Ed. 1093 (1937); United States v. Aluminum Co. of America, 148 F.2d 416, 445–446 (2d Cir. 1945). The more recent thinking is that only indisputable facts such as matters of common knowledge and matters capable of certain verification will be judicially noticed. When noticed such facts are binding on the trier of the facts. Morgan, The Law of Evidence, 1941–1945, 59 Harv.L.Rev. 481, 482–87 (1946); McCormick, Evidence § 330 (1954); McNaughton, Judicial Notice, 14 Vand.L.Rev. 779 (1961); Alvary v. United States, 302 F.2d 790, 794 (2d Cir. 1962).

▆ I do not have to resolve the debate among scholars concerning the taking of judicial notice during trial. It is clear to me that after a default only indisputable facts should be noticed to contradict allegations of the complaint. Otherwise a preliminary hearing would be necessary to afford plaintiff a chance to rebut factual material which a defendant claims should be judicially noticed. See the *Ohio Bell* and *Alcoa* cases, *supra*. In effect it would permit a defendant to litigate facts which are foreclosed by a default under the *Thomson* and *Harshman* cases, *supra*.

▆ In determining indisputability, the courts will consider "the nature of the subject, the issue involved, and the apparent justice of the case." McCormick, Evidence § 330, at 709 (1954). Each of these factors counts against noticing the proposition offered by defendants. First, the subject of the proposition is not scientific, historical, geographic or statistical matter of the kind courts are most willing to notice. Instead it is a garden variety proposition about who did what, when and where. Second, the facts which defendants wish judicially noticed in this litigation would be relevant to the central issue of liability under the antitrust laws. The more critical an issue is to a case, the more reluctant courts should be to determine it by taking judicial notice. Third, the apparent justice of the case in the posture of a default based upon wilful refusal to appear for deposition requires me to resolve all doubts against defendants.

▆ The defendants are urging that certain facts are indisputable because they appear in orders of the CAB and material in the CAB files. While judicial notice may be taken of the existence and contents of such material, it does not follow that the court will take judicial notice of the truth or accuracy of the contents. Stasiukevich v. Nicolls, 168 F.2d 474, 479 (1st Cir. 1948). In that case the court found that "the findings are merely evidence of the facts asserted," and went on to state that "of course, the other party may introduce evidence tending to prove the contrary of the facts asserted in the official report." Since a finding is merely evidence and is rebuttable, it cannot be considered indisputable. As to material in the CAB files, it stands on even weaker footing, since it has not been subject to any sort of examination of an adversary nature.

Defendants argue that TWA has failed to establish that it received late or inadequate deliveries of jet aircraft as a proximate result of the conduct of the defendants in violation of the antitrust laws. They assert that the claim "is defective for the further reason that the plaintiff has failed to establish by a preponderance of the evidence that, but for defendants' conduct, it would and could have accomplished the results now asserted."

It has been said of "proximate cause" that:

"There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion * * * Much of this confusion is due to the fact that no one problem is involved, but a number of different problems, which are not distinguished clearly * * *." Prosser, Law of Torts 240 (3d ed. 1964).

The question of proximate cause involved in this case arises out of a distinction between the *fact* of damage and the *amount* of damage. The Supreme Court explained this distinction recently in Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571, 23 L.Ed.2d 129 (1969):

"Zenith's burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage."

■ Basically defendants seek to deny that they caused *any* injury to TWA, i. e., to deny the *fact* of damages. The fact of damages, however, is an element of liability. The complaint alleges that the defendants committed certain acts which caused injury to TWA. The allegations are admitted by the default and the fact of injury is thereby established. The only question remaining is the amount of damages defendants should pay TWA.

■ When we come to the computation of the amount of damages in an antitrust case, we look to the rules enunciated in Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Those rules are that the trier of the facts must use the most precise proof available, that even where a defendant by his own wrong has prevented a more precise computation, the award may not be based on speculation or guesswork, and that the award must be predicated on a just and reasonable estimate of the damage, based on relevant data.

■ Finally, the report must be reviewed in the light of the strong presumption in favor of the findings of fact made by the special master. They are to be *accepted unless clearly erroneous.* Fed.R. Civ.P. 53(e) (2); Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 689, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946); United States v. S. Volpe & Co., 359 F.2d 132, 134 (1st Cir. 1966); E. I. du Pont de Nemours & Co. v. Purofied Down Prods. Corp., 176 F.Supp. 688, 691 (S.D. N.Y.1959). This rule is the same as Rule 52(a), which is applicable to findings of fact made by the trial court in a nonjury case. Such a finding is clearly erroneous only where "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

The complexity of the proof in this case is attested to by the nature of the testimony proffered by the parties. Intricate questions of engineering, finance and economics were involved.[2] They

---

2. An example of the complexities of the proof may be found in the following quotation from the report (page 94) which relates to testimony affecting only one aspect of an item of damage:

"The above formula for the B–331s was determined by a method commonly recognized by statistical experts for determining relationships between two variables, and known as regression analysis or as the method of least squares (Tr. 7805–6). As an example, by plotting on graph paper aircraft hours operated (independent variable) and amount of operating expenses (dependent variable) for several airlines, one can connect the dots on the graph with a straight line which represents an average relationship between the points. There are various standards for placing the straight lines, but the method of least squares fits the line to the various observations (dots) so as to reduce the squares of

were reviewed and resolved with painstaking care by a special master of extremely high competence. Especially apt here is the language of the court in Badenhausen v. Guaranty Trust Co., 145 F.2d 40, 53 (4th Cir. 1944), cert. denied, 323 U.S. 797, 65 S.Ct. 440, 89 L.Ed. 636 (1945), referring to the effect to be given to the findings of a special master who prepared a plan of railroad reorganization:

"Especially imperative is the rule when, as here, the master has lived with the case for four years, has patiently studied the complex questions involved and has listened with painstaking care in extended hearings to the arguments and proposals of all the parties who desired to be heard."

To the same effect, see Santa Cruz Oil Corp. v. Allbright-Nell Co., 115 F.2d 604 (7th Cir. 1940).

Bearing these considerations in mind, I will first pass upon the specific objections by the defendants to the report of the special master.

*Defendants' Objections to the Report of the Special Master*

 I. Determinations Relating to Defendants' Alleged Antitrust Violations.
 A. Facts which defendants claim should have been found.

Objections 1–3 and 13. The suggested findings as to CAB approval are irrelevant to the proceedings and were so ad-

judged by this court on defendants' motion to dismiss (214 F.Supp. 106), which determination was affirmed by the Court of Appeals (332 F.2d 602) when it said at page 610:

"Nor do we find any merit in the defendants' alternative contention that the Civil Aeronautics Board, in approving Toolco's acquisition of control over TWA and certain specific transactions thereafter, immunized the defendants from the operation of the antitrust laws as to all the ramifications of these transactions."

Objection 4 with 11 subdivisions. These are suggested findings based on a suggested finding that Toolco never manufactured or supplied commercial transport aircraft to United States air carriers in competition with manufacturers and suppliers of such aircraft. First, the defendants by their default admit that they did engage in such activity. Second, the suggested findings do not necessarily clearly negative liability when all the allegations of the complaint are read together. Third, there is sufficient in the record on this default to justify the refusal of the special master to so find. In this regard, reference is made to the placing of orders by Toolco for Convair 880s built to the specifications of Capital Airlines, the placing of orders for Convair 990s built to the specifications of American Airlines, the sale of Boeing 331s to Pan American and the leasing of Convair 880s to Northeast Airlines.

the deviations (differences) to a minimum. It produces a line showing the average of the various lines that might be fitted to the observations. If one squares the deviations and divides by the number of observations, one gets the *standard error of estimate*; and, given a normal distribution of errors, 68% of the observations should fall within one standard of error and 95% of the observations should fall within two standard errors. Relationships based on fewer observations tend to be more untrustworthy, and results showing a large proportion of observations outside the standard error of estimate

likewise tend to be untrustworthy unless validated by independent means.

"No claim was made by Simat that regression analysis was anything more than a statistical method useful in testing the validity of assumptions made by non-mathematical observations and raw data and conclusions based thereupon. Nevertheless Simat was of the opinion that the statistics produced by regression analysis under the assumptions made in his report confirmed his expert opinion as to the financial results that would have been obtained under the relevant equipment assumptions."

Objections 5–8. The suggested findings that during the period covered by the complaint Hughes did everything to explore the source of supply of jets in the best interests of TWA fly directly in the face of the alleged wrongdoing by the defendants which is admitted by the default. Additionally the record contains evidence to the effect that Hughes was not acting solely in the best interests of TWA in the development of the Model 18 by Convair.

Objections 9, 9a, 9b and 10. These are suggested findings that defendants did not engage in financing the acquisition of aircraft in competition with insurance companies, commercial banks or other lending institutions and that TWA obtained such financing from various airplane manufacturers and banks. I fail to see their relevancy in view of the charges contained in the complaint which are, in effect, that defendants dictated to TWA the methods and means of financing the acquisition of aircraft. See paragraphs 10(g), 23, 24, 26, 27 and 28 of the complaint.

Objections 11 and 12. These are suggested findings that Atlas never manufactured or developed aircraft and submitted a proposal pursuant to an agreement with Toolco for merger of Northeast Airlines and TWA which was reported as being fair. The default admits the allegations of the complaint regarding the conspiracy and that the proposed merger was advantageous to the defendants and disadvantageous to TWA. Further, as regards TWA reports favorable to the merger, the domination and control of TWA by Hughes must be taken into consideration in evaluating such reports.

B. Findings claimed to be clearly erroneous.

Objections 14, 15 and 17 to the findings that the activity by Toolco constituted "engaging in" the development and manufacture of aircraft by Toolco. The record is sufficient to sustain these findings.

Objection 16 to the finding that Toolco was engaging in this activity when TWA should have been arranging for purchases from other suppliers. This finding is sustained by paragraphs 16, 17, 24, 25 and 26 of the complaint.

Objections 18, 19 and 20 to the findings regarding the purchase of Pratt & Whitney engines, Toolco's trading on its delivery positions as to jets and Toolco's refusal to assign to TWA its rights to acquire jets. These objections are predicated on an assumption that the findings were made after a contested trial following full pretrial discovery procedures. Obviously it is not open to defendant to claim, as it does in objection 20, that it disproved the allegations in paragraph 18 of the complaint, or that the engines were purchased for TWA's best interests and were not resold at a profit.

Objection 21 to the finding that TWA's management was dominated by Hughes is clearly frivolous. The finding is not only admitted by the default, but was so found in 32 F.R.D. at 606 and 332 F.2d at 614.

Objection 22 to the finding that the factory representatives were Toolco employees reporting to Rummel as the representative of Toolco is captious. The record shows that Rummel was Toolco's special representative even though he received compensation from TWA. The factory representatives reported to a TWA employee, Rourke, who reported to Rummel. If Rourke had been paid by Toolco, reimbursement would have been made to Toolco by TWA as part of the cost of the aircraft.

C. Conclusions of law claimed to be erroneous.

Objections 1–12 are directed to conclusions of law made by the special master. His findings of fact have been sustained by the rulings on the objections made above. Paragraphs 9 and 10 of the complaint have been admitted by the default and defendants' judicial notice argument has been rejected. The conclusions of law are further buttressed

by the opinion of the Court of Appeals that the specific transactions alleged to have been effected by the defendants state a cause of action under the antitrust laws. 332 F.2d 602, 611. These objections are overruled.

## II. Determinations Relating to TWA's Claim That It Received an Inadequate and Late Jet Fleet.

### A. Facts which defendants claim should have been found.

Objections 1, 2, 3 and 4 are suggested findings similar to those in objections 6 and 7 in I A, *supra,* and are similarly disposed of. It is frivolous to claim that this record could possibly sustain a finding that TWA was an independent negotiator.

Objection 5. The suggested finding that defendants' negotiations with Convair in 1955 did not restrain trade takes a mediate fact, meaningless without other mediate facts, and draws a negative conclusion of law out of context.

Objections 6, 7, 8, 9, 11, 12, 13, 14 and 16. These suggested findings are misleading. They state facts which assume that the conditions were not of defendants' doing. The assumption is wrong, since the state of the record on liability shows that defendants' conduct brought about the fact situation, and it is this very conduct which is the basis of TWA's complaint. Furthermore, reliance on achieving better delivery dates with an increase in orders only buttresses TWA's position that prompt action with its welfare in mind would have achieved even better results.

Objections 10 and 15. These are suggested findings that TWA equalled its domestic competitors in jet service in 1959, and in 1960 flew more transatlantic seats relative to Pan American and earned a higher operating revenue than Pan American. Assuming the suggested findings to be true, they miss the point in issue that defendants' actions prevented even better results from being achieved.

Objection 17. This is a suggested finding that TWA has failed to show that it would have ordered jet aircraft in 1955 from Boeing rather than from Douglas absent the exercise of any control by defendants. The default precludes the necessity of making any such showing.

Objections 18, 19 and 20. The suggested findings that Toolco in 1959 determined that it was advisable to reduce the planned jet fleet and that Thomas and the firm of Coverdale & Colpitts agreed are negatived by the default and are not borne out by the record.

Objection 21. The suggested finding that in the spring of 1959 TWA was in poor financial condition ignores the allegations of paragraphs 4, 10(b), 10(g), 23, 24 and 26 of the complaint regarding Toolco's domination and control of TWA.

Objection 22. The suggested finding that it was not unusual for an airline to cut back initial jet orders covers only part of the relevant fact. The remainder is that such an airline would, and did, at the same time increase orders for other models.

Objection 23. The suggested finding that TWA has failed to show domination by defendants preventing the exercise of independent judgment by the executives of TWA completely ignores the default.

Objection 24. The suggested finding that Rummel was a middle echelon executive with no power of decision as to what equipment could be purchased by TWA ignores the record, unless it be defendants' contention that the decision as to what equipment could be purchased was lodged in Hughes.

Objections 25 and 33. The suggested findings that the decision to reduce the size of the initial jet fleet and that the administration of the Convair contract by defendants were not in restraint of trade are contrary to the admissions made by the default.

Objection 26. The suggested finding that Thomas and the board of directors of TWA ratified the transfer by Toolco

of six of the Boeing 331s to TWA's competitor Pan American overlooks the admitted exercise of control and domination of TWA by Hughes.

Objection 27. The suggested finding that the transfer was not in restraint of trade is contrary to the admissions made by the default.

Objections 28, 29 and 29A. These are suggested findings that TWA has failed to show that absent control by defendants it would have ordered 63 jets, that it could have financed such fleet and obtained earlier delivery dates. The default precludes the necessity of making any such showing.

Objections 30, 31 and 32. These are suggested findings that failure to meet the delivery schedule of the Convair 880s was not defendants' responsibility, that such delay was attributable to Convair, even after January 1961. The suggested findings are contrary to the admissions inherent in the default and to the testimony in the record.

Objection 33. The suggested finding that TWA has failed to show that defendants' administration of the Convair contract unreasonably restrained trade ignores the effect of the default.

### B. Findings claimed to be clearly erroneous.

The objections under this subdivision are numbered 34 through 74. In the main, the findings attacked are just the opposite of what defendants claim the special master should have found as set forth in objections 1 through 33 in II A above.

 The findings made by the special master which are referred to in this subdivision are not clearly erroneous. As to objection 56 to the finding that the hypothetical jet fleet and reconstructed delivery dates constitute a proper basis for computing damages, I refer to the discussion of the *Bigelow* case, *supra*. Many of the findings are clearly established by the admissions inherent in the default. Others rely on disputed evidence in the record, but obviously this does not require their rejection under the "clearly erroneous" rule. In addition to these comments for overruling the objections, I refer to specific comments made in ruling on objections 1 through 33 in II A above.

### C. Conclusions of law claimed to be erroneous.

Objections 1, 2 and 3 have been disposed of in the discussion of proximate cause and the *Bigelow* case, *supra*. The remaining objections 4 through 14 are directed toward conclusions of law which are amply supported by the findings of fact sustained by the above rulings.

### III. Determinations Relating to TWA's Claim That It Was Injured by Leasing Jet Aircraft from Toolco.

#### A. Facts which defendants claim should have been found.

Objection 1. The suggested finding that the leases of jets in 1959 and 1960 were made pending consummation of permanent financing disregards the admissions of the allegations in paragraph 20 of the complaint.

Objections 2 and 3. The suggested findings that the leases were approved by the CAB and did not disclose any restrictions in acquisitions by TWA are subject to the same rulings made on objections 1–3 and 13 in I A above. The leases were between Toolco and its controlled TWA.

Objections 4 and 5. The suggested findings that there is no evidence that the rentals were unreasonably high and that Toolco received no rental until December 30, 1960 are immaterial.

Objection 6. The suggested finding that there is no testimony that TWA would have purchased rather than leased the jets absent the alleged conduct of defendants in violation of the antitrust laws is subject to the same ruling made with regard to objection 17 in II A above.

B. Findings claimed to be clearly erroneous. ·

Objection 7 to the finding that the leased jets were the first made available to TWA by defendants during the years 1955 to 1960 is overruled because there is no such finding.

Objection 8 to the finding that the leases were made with the understanding that TWA would not lease or purchase jets from other potential suppliers is overruled because of the admission of the factual allegations of paragraph 20 of the complaint.

Objections 9, 10 and 11 refer to statements of contentions by the special master and are not findings.

C. Conclusions of law claimed to be erroneous.

Objections 1 through 5. In view of the rulings and comments on the objections referred to in A and B of this part, the conclusions of law made by the special master, referred to in objections 1 through 4, are correct. Objection 5 to the use of interest cost of capital is more an objection to a finding of fact and is overruled because the finding is not clearly erroneous.

IV. Determinations Relating to TWA's Claim for Lost Operating Profits.

A. Facts which defendants claim should have been found with reference to the International Division.

Objections 1, 2, 3 and 4. These are suggested findings that TWA has failed to prove damage in this category based on assumptions of TWA's expert. They are predicated on finding that the figures of defendants' experts are correct. The refusal to make such findings was not clearly erroneous.

Objection 5 is a suggested finding that there is no evidence in the record to justify an assumption that TWA would have leased Boeing 331s to Northeast in October and November 1959. The assumption made by TWA's expert was justified on the facts as to the time of year and passenger demand.

B. Findings claimed to be clearly erroneous with reference to the International Division.

Objection 6 is to the finding that there would be an $89.3 million increase in operating revenue. This finding is not clearly erroneous.

Objections 7 through 7j. These objections except 7i are directed to findings as to the "competitive response" which defendants' expert relied on in his computations. The findings are supported by the record and are not clearly erroneous. Objection 7i is to the finding that TWA's comparative shortage of jet equipment caused it to lose its market position. The finding is supported by the record.

Objection 8 is to the finding relating to "beyond-the-gateway and charter service passengers." This finding is supported by the record.

Objections 9, 9a and 9b. These objections disagree with the special master's findings as to operating costs. The findings are supported by the record.

C. Facts which defendants claim should have been found with reference to the Domestic Division.

Objection 1. The suggested finding that there is no evidence that TWA would have leased four Boeing 720Bs or bought 18 Boeing 131Bs would not be a correct finding. The record justifies the opposite finding made by the special master.

Objection 2. The suggested finding that TWA has failed to prove that its net operating profits would have increased is predicated on accepting defendants' evidence. The conflict in the evidence was for the special master to resolve and his contrary finding is supported by the evidence.

Objection 3 is a suggested finding that TWA has failed to prove that its average

rate of capacity could have been maintained with an added jet capacity. The suggested finding relies on the testimony of defendants' expert which the special master was entitled to reject.

Objection 4 is a suggested finding that in the 1959–1963 period there was an acute overcapacity which alarmed the CAB as well as the airline industry. The suggested finding does not affect the fact that under proper conditions TWA would have been able at least to maintain its competitive position in relation to other carriers. See chart at page 138 of the report.

Objection 5 is a suggested finding that as airlines added jet capacity in 1959–1963 the load factors steadily declined. The implication of this suggested finding disregards the fact that with an adequate jet fleet TWA's position would have been different. See page 133 of the report.

D. Findings claimed to be clearly erroneous with reference to the Domestic Division.

Objections 6 and 13 to the findings as to increased transportation revenues and increased operating costs are overruled. The findings are supported by the record.

Objections 7 and 8 are to the findings as to TWA's shortage of jet equipment. The findings are supported by the record.

Objections 9, 9a and 9b to the findings using the average annual load factor in estimating added traffic are overruled. See comments on the immediately preceding objections 3–5.

Objection 9c. The objection does not encompass the complete finding of the special master.

Objection 9d. The finding objected to is correct in the context used by the special master.

Objections 10, 10a, 10b, 10c, 10d, 10e and 10f. These objections go to findings by the special master in which he refused to accept defendants' testimony as

to "marginal load" factor as opposed to accepting TWA's testimony as to "annual average load factor." Here again there is present a conflict of testimony which the special master was justified in resolving as he did. See the findings to which objections 9, 9a and 9b immediately above are directed.

Objection 11 is to the finding that TWA testimony adequately takes into account changes in stage lengths accompanying the introduction of jets. The special master simply resolved the conflicting testimony on this subject and his finding is supported by the record.

Objections 12 and 12a. Here again the objections are predicated on the refusal of the special master to accept the testimony of defendants' expert as opposed to that of TWA's expert. The objections are overruled.

E. Fact which defendants claim should have been found with regard to the added cost of operating the Boeing 331s.

Objection 1. The suggested finding that there would have been increased costs in operating five 331s over the actual cost of operating five 331Bs which were leased is predicated on accepting defendants' testimony. The special master was justified in refusing to do so for the reasons stated in the report.

F. Facts which defendants claim should have been found with regard to mitigation of damages,.

Objections 1 and 2. These are suggested findings that Toolco offered TWA four Convair 880s in 1961 which TWA refused and that TWA could have acquired additional jets in 1961–1963, which it failed to do. The suggested findings completely ignore the existence of the new management of TWA, its problems with defendants at the time, and its business judgment to concentrate on Boeing planes for the best interests of TWA.

G. Finding claimed to be clearly erroneous with reference to mitigation of damages.

Objection 3 to the finding that the purchase of four Convair 880s was not feasible as a business matter is overruled. See comment on the immediately preceding objections 1 and 2.

H. Conclusions of law claimed to be erroneous.

Objection 1. The import of the conclusion as set forth in this objection does not appear in the report.

Objection 2. The application of the standards of proof set forth in the *Bigelow* case, *supra,* is proper.

Objection 3. The special master was justified in accepting the testimony of TWA's expert.

Objections 4, 5 and 6. The special master acted properly with regard to the matters to which these objections are made.

Objection 7. This objection ties in with objection 1 in E immediately above and is similarly disposed of.

Objection 8. This objection does not correctly reflect the cited page of the report. The conclusion reached by the master there was proper.

V. Determinations Relating to TWA's Claim for Disruption of Its Business.

A. Facts which defendants claim should have been found.

Objection 1. The suggested finding that the defendants were not responsible for late deliveries of the 880s has been rejected above (II A, objections 30–33).

Objection 2. The suggested finding that TWA was not subject to expenses it would not otherwise have incurred is not sustained by the record.

Objections 3, 4, 5 and 6. These are suggested findings that TWA was not damaged by reason of certain payments made to maintenance instructors and crew members, or costs allocated for use of a simulator and transition training plane. The suggested findings overlook the fact that TWA was paying for enforced idleness and refresher training made necessary by the delays. These are proper items of damage.

VI. Determinations Relating to the Computation of the Amount of the Damage Award.

A. Facts which defendants claim should have been found.

Objections 1 and 2. The suggested findings relate to a $12.3 million increased cost of capital on advance deposits and progress payments for the reconstructed fleet. The special master explained that to make such findings would "involve elaborate calculations and several speculative assumptions." The suggested findings are not supported by the record.

Objection 3. The suggested finding regarding the cost· of purchasing the theretofore leased jets is incomplete and misleading standing alone.

B. Findings claimed to be clearly erroneous.

Objection 4 is to the finding refusing to make provision for increased cost of capital on advanced deposits and progress payments. The finding is merely the opposite of what defendants claim should have been found as detailed in objections 1 and 2 in IV A above. The objection is overruled.

Objection 5 is to the finding which added interest cost on advance deposits for twenty 880s to TWA's capital base. The finding is not clearly erroneous.

Objections 6 and 7 are to the findings excluding capital expenditures for ratable parts, expendable parts and construction work. The findings are not clearly erroneous.

Objection 8 is to the finding limiting to the years 1959 and 1960 the increased interest cost of owning instead of leasing the jets. The special master was justified in making the finding.

C. Finding claimed to be erroneous regarding the use of TWA Exhibit 50.

Objection 1 is to the finding that the principles of combination and adjustment used by TWA's expert were proper. The special master was justified in making this finding.

D. Conclusions of law claimed to be erroneous.

Objection 1 is to the use of the external borrowing rate and is overruled.

Objection 2 relates to objection 4 in VI B above and is overruled.

Objection 3 to the adjustments of TWA's historical financial statements is overruled.

### TWA's Objections to the Report of the Special Master

 TWA has filed objections to the report on the following grounds:

1. The award as a whole is inadequate.

2. The special master erred in rejecting TWA's comparative profit measure of damages.

3. The award on TWA's claim for losses in operating profits is inadequate.

4. The award on TWA's claim for losses due to leasing jets from Toolco is inadequate.

5. The special master erred in denying damages for losses connected with financing the jet fleet.

6. The special master erred in denying damages for losses due to delay in disposing of the displaced piston aircraft.

7. The special master erred in finding that TWA is not entitled to an award of prejudgment or moratory interest.

I. Inadequacy of Total Award.

The contention that the award as a whole is inadequate is predicated on a claim that it permits the defendants to retain the fruits of their wrongdoing.

Toolco is alleged to have acquired its stock interest in TWA at a cost of $94 million. On May 3, 1966 it sold this stock for a net price of $545.8 million, with a resulting profit of $452 million. After payment of the 25% capital gains tax, the net profit after taxes is calculated at $339 million. I am advised that any judgment for damages in this case is fully deductible from current income for tax purposes. Therefore, on the award recommended by the special master, the ultimate cost to Toolco of paying such award would only be $75 million, leaving Toolco with a net net profit of $265 million. TWA claims that Toolco should not be permitted to retain this amount since it violates the theory of unjust enrichment.

 The fallacy in the application of this theory to this case is that the profit on the sale of the stock is not attributable to the illegal acts of the defendants. Defendants' control and domination of TWA ended on December 30, 1960. TWA does not seek damages for the period subsequent to 1963 because it claims that by the end of 1963 the ill effects of defendants' control had been eliminated. At that time the stock was selling at about $32 a share compared with $86 a share at the date of sale. Therefore, the high value that the TWA stock reached in 1966 had nothing to do with the acts of the defendants. There is no dispute that Toolco's acquisition of the controlling interest in TWA was legal. It was the improper exercise of control that is attacked by the complaint. 214 F.Supp. at 109–110. What TWA seeks under this objection is not damages based on unjust enrichment flowing from the acts of the defendants, but rather punishment not within the contemplation of any accepted measure of damages. The cases relied on by TWA (*Bigelow, supra*; Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918); Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)) are not in point, since they speak of the unfairness of permitting a defendant to retain the profits flowing from his illegal acts.

This objection is overruled.

II. The Comparative Profit Measure of Damages.

TWA claims that the special master erred in not using its comparative profit studies as the measure of damages. One such study showed losses to TWA of approximately $170 million. Another showed losses of $121 million. TWA advanced a second measure of damages based on specifically computed losses claimed to flow from the defendants' conduct. The special master proceeded on this theory, but only awarded $45 million of TWA's claim of $105 million.

The first argument to support the comparative profit measure of damages is related to TWA's claim of unjust enrichment. Since the unjust enrichment theory has been rejected, this argument for the use of comparative profit studies fails.

TWA then argues that the comparative profit study is a proper and standard method of measuring damages without regard to the amount that it would produce. The special master rejected the comparative profit studies because there was a more precise method of ascertaining damages, which was the method he used. Further, he found that the comparative profit study was based on indefinite allegations of the complaint. The method he used was predicated on more specific allegations of the complaint. TWA's reliance on *Bigelow, supra,* for the use of the comparative profit measure of damages is misplaced. In that case the Court found at page 266 of 327 U.S. at page 580 of 66 S.Ct. that it was proper to use comparative receipts to measure damages because the defendants' "wrongful action had prevented petitioners from making any more precise proof of the amount of the damage."

This objection is overruled.

III. Inadequacy of Award for Losses in Operating Profit.

TWA complains that in determining the "cost of capital" factor in computing operating profit the special master erred in using 6% for 1959 and 6.3% for 1960. If the jet fleet had been available for use by TWA at the times it should have been, TWA would have needed capital at those times to finance the purchase of the jets. The interest paid for borrowing the money would be a cost factor to be added to other operating expenses each year, and would be offset against the expected receipts to determine the operating profits that would be realized if there had been an adequate jet fleet.

The special master first determined the amount of money that had to be available beginning in 1959 to finance the purchases based on the "reconstructed" delivery dates of the aircraft. He then applied TWA's historical external borrowing rate at those times to arrive at the yearly cost of capital.

TWA contends that it was error to use this rate because its financial condition and the program of financing it followed were the result of the illegal acts of the defendants. It claims that if it had been free of restraint it could have undertaken financing in 1955, and that the maximum cost of borrowing would have been only the 4¾% paid by its competitors in 1955 and 1956 rather than the 6 to 6½% it paid in 1960.

The use of the lower rate for "cost of capital" would increase the operating profits found by the special master for the years in question, and would result in an increase of $4.9 million (before trebling) in the award for this item of damage.

The special master rejected TWA's theory of damage on losses connected with financing the jets (see V below). Included in that loss was a projected cost of capital predicated on what TWA might have done in the area of financing in 1955. In view of this ruling, the rate of interest paid by competitors in 1955–1956 is not the true measuring rod. Rather, the rate paid by competitors in 1959 and 1960 is the more accurate figure. The record shows that it ranged from 5 to 6½%, not significantly different from the 6 and 6.3% rate used by the special master.

This objection is overruled.

IV. Inadequacy of Award for Losses Due to Leasing Jets from Toolco.

TWA seeks an increase of $1.6 million (before trebling) in the award for this item of damage. What has been said in III above applies equally as well to this objection. This objection is overruled.

V. Refusal to Award Damages for Injuries Alleged to Have Been Suffered in Financing the Jets.

It is the claim of TWA that the illegal acts of defendants with respect to financing the acquisition of jets by TWA caused it damage in the amount of $30 million. The claimed damage is based on the difference in its cost under the program which it was forced to adopt and a plan which it claims an independent TWA would have adopted. TWA offered expert testimony by Drexel Harriman Ripley, Inc., a firm of investment bankers, as to what an independent TWA would have done to provide adequate financing for the jet age. Defendants countered with their expert, Loeb, Rhoades & Co., a firm of investment bankers.

The special master reviewed the conflicting testimony in detail in pages 186 through 264 of his report. TWA claimed it would have undertaken financing operations in May 1955, October 1955 and May 1959. It appears that the latter two financings depended on "the prudence and doability of the May 1955 equity financing."

The special master referred to the standards of the *Bigelow* case (see page 12 of this opinion) and also noted that he was aware that TWA's financial condition in 1955 reflected the influences of Toolco. He then stated (page 258 of the report):

"However, after careful deliberation, I have determined that TWA has not established that a prudent and competent management of TWA acting independently and free of any control or interference on the part of Toolco would and should have calculated in the spring of 1955 the amount of the financial requirements of TWA for the jet aircraft age. It is also my determination that an independent and prudent TWA management would not have accepted the recommendation of Drexel Harriman Ripley that TWA sell in May 1955 $55.5 million (net proceeds) in common stock of TWA.

"For me to find to the contrary would in my opinion endow Drexel Harriman Ripley and an independent prudent Board of TWA in 1955 with a prescience, wisdom and perfection of timing that exceeds the natural capacity of the most experienced men acting without the benefit of hindsight."

The special master pointed out that no alternative theory of damages was presented by either TWA or the defendants. After discussing in detail the basis for his findings, the special master concluded that TWA had failed to sustain its burden of proof as to damages claimed to have been suffered as the result of the financing program that it was forced to adopt.

As already indicated, proof as to the amount of damages is unfettered by the effect of the default. The resolution of conflicting testimony is a question for the special master and the clearly erroneous rule is applicable.

This objection is overruled.

VI. Losses on Sales of Used Piston Aircraft.

TWA complains that the special master erred in refusing to award any damages for claimed losses on the sale of piston aircraft. It admits that no other area of damages presented quite such complex questions of computation. The amount of damages it seeks under this item is $2.7 million.

TWA takes the position that when jets were introduced into service pistons were made obsolete. Therefore, any delay in delivery of jets must have caused delay in the disposal of pistons. Since the market price of pistons steadily declined during this period, it is claimed that a loss to TWA resulted.

Here again the difference must be recognized between the fact of injury which is admitted and the amount of damages which TWA must show flowed from that injury. The special master found that TWA had failed to sustain its burden of proof on this item of damage and detailed his reasons on pages 272 through 295 of his report. I have reviewed those findings and find that they are supported by the record.

This objection is overruled.

VII. Moratory Interest.

TWA has asked to be awarded moratory, or prejudgment, interest on its recovery. This raises the question whether moratory interest is within my power to grant in an antitrust action for treble damages.

 The right to interest on a sum recoverable under a federal statute is determined by federal, not local, law. Rodgers v. United States, 332 U.S. 371, 373, 68 S.Ct. 5, 92 L.Ed. 3 (1947); Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 715, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). Under federal law interest is not available on sums recovered as penalties. Rodgers v. United States, *supra;* United States v. United Drill & Tool Corp., 87 U.S.App.D.C. 236, 183 F.2d 998, 1000 (1950) (dictum). Some cases have ruled that interest is also unavailable on double or treble damage recoveries in certain circumstances. Brooklyn Sav. Bank v. O'Neil, *supra* (Fair Labor Standards Act); United States v. Globe Remodeling Co., 196 F.Supp. 652, 658 (D.Vt.1961) (False Claims Act).

Relying on *Brooklyn Bank,* Judge Wyzanski denied moratory interest in a treble damage antitrust case. Cape Cod Food Prods., Inc. v. National Cranberry Ass'n, 119 F.Supp. 900, 911 (D.Mass. 1954). He cites an unpublished decision by Judge Caffey in this district which reaches the same result. A different result is suggested by the rationale of United Mine Workers v. Coronado Coal Co., 258 F. 829, 846–847 (8th Cir. 1919), rev'd on other grounds, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R.

762 (1922), but that decision came before *Brooklyn Bank* or *Rodgers.*

 Interest should not be allowed in antitrust actions where the statute provides for punitive damages. Treble damages compensate a plaintiff handsomely for all his losses, including loss of the use of money rightfully his.

This objection is overruled.

*Conclusion*

The report of the special master awarding damages in the sum of $137,611,435.95 pursuant to 15 U.S.C. § 15 is confirmed.

So ordered.